1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ABEL CANO,

11                 Plaintiff,                    No. CIV S-07-2203 JAM GGH P

12          vs.

13   DR. B. NAKU, et al.,                        ORDER &

14                 Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17                 Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

18   1983.  Pending before the court are: 1) plaintiff's amended motion to compel discovery responses

19   from defendant Traquina, filed on June 22, 2009, to which Traquina did not file an opposition; 2)

20   defendant Naku's motion for summary judgment, filed on June 26, 2009, to which plaintiff filed

21   an opposition, after which this defendant filed a reply.

22   Complaint

23                 The court has previously set forth plaintiff's allegations in this matter, see Order,

24   filed on June 4, 2009, pp. 2-4, as follows.  This matter proceeds upon plaintiff's complaint, filed

25   on October 17, 2007, against defendants Dr. B. Naku and Dr. Alvaro C. Traquina, Chief Medical

26   Officer (CMO), both employed at California State Prison-Solano (CSP-Sol).  The gravamen of

his complaint is that following a slip as he left the shower, on May 21, 2006, at CSP-Sol, and

falling on a wet tile floor that had no rubber mats, plaintiff suffered a break in his right wrist

bone for which his subsequent treatment has been "abysmal"; from the time of the injury until the

October 9, 2007, filing date of this action (per the mailbox rule), plaintiff contends that he has

received "little more than Tylenol to treat the pain," and deficient treatment for the break.

Complaint, pp. 1-3.

Plaintiff states that when he fell he experienced a sharp pain in his right wrist, was

seen by a Dr. Tesla R. Rallos (not a defendant), on May 23, 2006, who, noting redness and

tenderness at the wrist joint, ordered x-rays, a splint, a light duty chrono and a four-week follow-

up.  On May 24, 2006, x-rays were taken.  The radiologist's findings and impression were as

follows:

> FINDINGS: Subtle irregularity is seen in the region of the
> proximal carpal row on the lateral view only.  The pattern suggests
> a non displaced triquetrial fracture.  The remainder of the osseous
> structures are unremarkable.
>
> IMPRESSION: Probable non displaced triquetrial fracture.  Clinical correlation
> regarding pain at this location is recommended.

Complaint, p. 3, Exhibit (Ex) C.

Plaintiff asserts that no further treatment was provided at that time.  Plaintiff was

seen on July 7, 2006, by defendant Dr. Naku, who noted the "nondisplaced right triquetrial

fracture," and ordered "a repeat of the x-rays and an orthopedic consult."  Nevertheless, despite

the passage of seven weeks from the time of the injury, plaintiff received no further treatment.

Id., Ex D.

When, two weeks later, plaintiff filed a 602 appeal as an "emergency appeal" for

treatment, indicating that he had had a broken wrist bone since May 21, 2006, that had never

been treated or put in a cast, a CSP-Sol medical administrator named Laura Mefford (not a

defendant), on July 26, 2006, prepared an authorization request to be signed by defendant CMO

Traquina for plaintiff to be treated at the UC Davis Ortho/Trauma Clinic in Sacramento.

1    Complaint, p. 4, Exs E & F.

2          In response to the request, on August 2, 2006, plaintiff was seen at UCD

3    Orthopedic Outpatient Services and a diagnosis and treatment plan were formulated.  Id., Ex. G.

4    Upon his return from UCD, plaintiff was not given further treatment on Aug. 2, 2006., Id., Ex H.

5          On Aug. 30, 2006, about four weeks later, plaintiff was seen at the CSP-Sol clinic

6    by defendant Naku, who ordered Tylenol for plaintiff's pain, a wrist brace and a "CT [scan]" for

7    the right wrist.  Complaint, p. 5, Ex. I.  There was no further treatment.

8          On September 5, 2006, defendant Naku answered plaintiff's CDC 602 appeal,

9    partially granting it, telling plaintiff that UCD had recommended a CT scan of his right wrist and

10   that Naku had ordered one, and that plaintiff would be re-evaluated.  Complaint, p. 5, Exs J & K.

11          Plaintiff filed a second level appeal which defendant Traquina partially granted

12   but which provided no further treatment for plaintiff's wrist or wrist pain.  Complaint, p. 5, Ex L.

13   Following the response to his appeal to the director's level, also partially granting the appeal,

14   plaintiff's broken wrist bone remains untreated and the pain unabated.  Complaint, p. 6, Ex M.

15   Plaintiff contends that defendant Naku may be practicing medicine without a license.  Complaint,

16   p. 7.  Plaintiff states that his pain is currently ineffectively treated with Naprosyn, an anti-

17   inflammatory nonsteroid, but that "Tylenol Codeine 0.5 grain" decreases the pain much more

18   significantly.  Complaint, p. 8.  Plaintiff states that he will be subject to future motion limitation

19   and heightened pain in the affect[ed] wrist and that lack of treatment has caused a permanent

20   disability.  Complaint, pp. 8-9.  Plaintiff seeks injunctive relief in the form of future medical care

21   and money damages, including punitives, for alleged "deliberate indifference to a severe medical

22   condition."  Complaint, pp. 10-11.

23   Amended Motion to Compel

24          Plaintiff seeks an order to compel defendant Traquina's responses to plaintiff's set

25   two of interrogatories, requests for admission, set two, and production of documents, set two,

26   directed to him.  Amended Motion to Compel (MTC), pp. 1-8.  Plaintiff had brought a previous

                                                 3

1    motion to compel, which the court had denied as moot but without prejudice because it was

2    unclear, in light of supplemental responses that defendants had supplied, whether any requests

3    remained at issue.[1]  See, Order, filed on June 4, 2009, pp. 8, 11.  In that Order, the court stated,

4    inter alia, that plaintiff should inform the court within twenty days of specific discovery requests

5    that might remain at issue in light of defendant Traquina's supplemental responses.  Id., at 8-9,

6    11.  A response to any such filing would be due from defendant Traquina within fifteen days

7    thereafter.  Id.  As noted above, the defendant has failed to respond to the instant motion, which

8    was timely filed.

9          In his amended motion, plaintiff states that in light of defendant Traquina's

10   supplemental responses to interrogatories, set two, served on February 26, 2009, there is no

11   further discovery issue pending.  MTC, p. 6.  In addition, plaintiff concedes that no issue remains

12   as to the defendant's supplemental responses to set two of the requests for admission, or as to the

13   requests for admission, set three, in light of both the defendant's supplemental responses served

14   thereto, as well as the court's order, referenced above.  Id.  Plaintiff also concedes that a set four

15   of requests for admission should not have been referenced in his filings as they were not included

16   in his initial motion to compel and plaintiff further warrants that he no longer seeks monetary

17   sanctions, having been satisfied by the form of sanctions imposed in the June 2, 2009, Order.  Id.,

18   at 7.

19         Thus, the only requests that remain at issue are three requests for production of

20   documents from set two.  Plaintiff sets forth the following:

21         Request No. 1 :

22         Copies of medical guidelines regarding "services" and "the
           appropriate standard of care" as stated in defendant's Answer to

23

24         [1] Nevertheless, sanctions were imposed in the form of specified requests within set three
     of plaintiff's requests for admission being deemed admitted by defendant Traquina for that
25   defendant's apparently unwarranted dilatoriness in responding to the requests and "due to the
     ineffectual attempt at responding to plaintiff's motion."  See Order, filed on June 4, 2009, pp. 10-
26   11.

Complaint, dated March 27, 2008, page 1, line 28, to page 2, line 1. []

Response:

Objection.  Defendants' answer makes no specific reference to any medical guideline and is made by way of a general denial, for which no supporting facts are necessary.  This request also requires defense counsel's legal analysis and theories regarding the standard of care, which is equally available to plaintiff, and protected from disclosure by the attorney-client privilege and attorney work product privilege [Citation.][2] This request also calls for the premature disclosure of expert information.

MTC, p. 2.

Request No. 2:

Copies of any and all documents other than those described in request no. 1 which contain, mention, or discuss current guidelines for the diagnosis and treatment of broken bones for California state prisoners. []

Response:

Objection, this request seeks defendants' opinion or conclusion without establishing a proper foundation, this request also requires defense counsel's legal analysis and theories regarding the standard of care, which is equally available to plaintiff, and protected from disclosure by attorney-client privilege and attorney work product privilege.

MTC, p. 2.

Request No. 3:

Copies of any and all documents other than those described in request no[s]. 1 and 2 which contain, mention or discuss previous guidelines (within the past 10 years) for the diagnosis and treatment of broken bones for California state prisoners.

Response:

Objection, this request seeks defendants' [sic] opinion or conclusion without establishing a proper foundation, this request

---

[2] Although plaintiff does not provide a copy of the defendant's actual responses, instead re-typing each and excluding the specific citations, which are to state court cases, referenced in the responses, the court has reviewed Exhibit E to the original motion to compel and has verified

> also requires defense counsel's legal analysis and theories regarding the standard of care, which is equally available to plaintiff, and protected from disclosure by attorney-client privilege and attorney work product privilege. [Citation.] This request also calls for the premature disclosure of expert information."

MTC, p. 2.

Although plaintiff references supplemental responses to his requests for production of documents having been served on February 26, 2009, he does not include within this motion any supplemental response made by defendant to these three requests.  MTC, pp. 1-5. Plaintiff does, however, argue that the defendant's objections are not well-taken, from which the court will infer that no further response or production was served in the supplemental responses. Of course, the defendant's lack of a response to plaintiff's amended motion reinforces the court's inference.  In addition, it appears that plaintiff *has* included supplemental responses of defendant Traquina in an exhibit to his opposition to the motion for summary judgment brought by defendant Naku.  See Opp. to defendant Naku's MSJ below at pages 126-128, which confirms that defendant Traquina did not provide any documentation with respect to RFP nos. 2, 3 and 7, the only responses identified therein.

As to RFP nos. 1, 2 and 3, plaintiff takes issue with the defendant's representation in opposition to the prior motion (which opposition is no longer operative herein), wherein the defendant averred that he had "no knowledge of any responsive documents and rests upon all previous objections."  MTC, p. 4, referencing the Opp. to the prior motion at p. 3.  Defendant maintains that such a representation is undermined by Institution Operation Plans that were deemed admitted in the court's June 2, 2009, Order, at pp. 10-11 "and/or a palpable demonstration of constitutionally deficient medical care evidenced in Plata v. Schwarzenegger, No. CO 1-1351 THE (N.D. Cal.)."  MTC, p. 4.  As to the requests for admission to which plaintiff refers, he appears also to state that, independent of (and prior to) the court's order, this defendant had admitted the requests in responses served on February 26, 2009.  MTC, p. 3. Plaintiff states that it was only after he presented a copy of an Institution Operation Plan (number

6

1    CSPS-CS/MD-07-091) that the defendant admitted the existence of such plans for the prison's

2    medical department in response to requests for admission nos. 5 through 11, set three.  MTC, p.

3    3.  Plaintiff did not submit the admissions apparently served within by defendant Traquina within

4    this amended motion but because the court has separately deemed these among those requests

5    admitted, it is fair to say that defendant has indeed conceded that (cross-referencing to Exh. I of

6    plaintiff's original motion to compel) the CDCR[3] has several Institution Operations Plans (IOPs)

7    for the CSP[4]-Solano medical department; that these IOPs outline, inter alia, the procedures for

8    CDCR inmate patients; that they "establish policy and procedures for the treatment, diagnosis

9    and/or medical care for inmate-patients incarcerated at CSP-Solano;" that as Chief Medical

10   Officer (CMO) it is a duty of the defendant's to authorize implementation of the IOPs for the

11   CSP-Solano medical department; that the defendant has knowledge of the IOPs because he has

12   signed them in his capacity as CMO; that one IOP, for "specialty services," in Plan Number

13   CSPS-CS-07-091, dated Feb. 2007, and that this defendant signed that particular IOP.  See Exh. I

14   to plaintiff's original MTC.[5]

15           As to plaintiff's request for production (RFP) no. 1, the specific sentence referred

16   to states: "[defendants provided all services with competence and in conformity with the

17   appropriate standard of care."]  Answer, pp. 1-2.  Defendant's objection is well-taken to the

18   extent that plaintiff does appear to be asking this defendant to produce documentation in the form

19   of a medical guideline not referenced in the answer that supports his general denial in the answer.

20   The amended motion as to this request will be denied.

21   \\\\\

22   _____

23           [3] California Department of Corrections and Rehabilitation.

24           [4] California State Prison.

25           [5] In addition, in subsequently reviewing the motion for summary judgment brought by
     defendant Naku and included herein, it appears that plaintiff produced defendant Traquina's
     February 26, 2009, admissions in opposition to that motion.  See, Opp. to Naku MSJ, pp. 130-
26   132.

1    However, with regard to RFP nos. 2 and 3, those requests seek material arguably

2    relevant to the gravamen of this complaint and defendant, although interposing objections, has

3    not bothered to oppose this amended motion.  In addition, the objections do not appear to be

4    well-supported.  It is not understandable to the court how producing guidelines or procedures in

5    place at the state prisons for the treatment of broken bones requires defense counsel's legal

6    analysis and theories regarding the standard of care, how these documents would be equally

7    available to plaintiff, and how they come within the attorney-client privilege and attorney work

8    product privilege or how this request calls for the premature disclosure of expert information.  It

9    is equally not understandable how the two cases cited by defendant in objections, Alpine v.

10   Superior Court, 259 Cal.App.2d 45, 66 Cal. Rptr. 250 (Cal.App.2d 1968), and Nacht & Lewis

11   Architects, Inc. v.  Superior Court of California, 47 Cal. App.4th 214, 54 Cal. Rptr.2d 575 (Cal.

12   App. 3rd  1996), are apposite.  First, state law does not apply to this federal issue litigation.

13   Moreover, published state procedures or policies with regard to the medical treatment of broken

14   bones do not implicate either defendant's attorney-client or work product privilege.

15   Traditionally, eight elements are essential to the attorney-client privilege:

16           (1) Where legal advice of any kind is sought
             (2) from a professional legal advisor in his capacity as such,
17           (3) the communications relating to the purpose,
             (4) made in confidence,
18           (5) *by the client,*
             (6) are at this instance permanently protected
19           (7) from disclosure by himself or by the legal advisor,
             (8) unless the protection be waived.

20

21   Admiral Ins. v. U.S. Dist. Court for Dist. of Ariz., 881 F.2d 1486, 1492 (9th Cir. 1989)

22   (emphasis added); see also, Yurick ex rel. Yurick v. Liberty Mut. Ins. Co., 201 F.R.D. 465, 468

23   (D. Ariz. 2001).  The privilege protects communications made by the client.  The Supreme Court

24   has emphasized the fact that it is the confidential communication from the client to the attorney

25   that triggers the protection of the privilege.  Upjohn v. U.S., 449 U.S. 383, 394-395, 101 S. Ct.

26   677, 685 (1981); see also Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 862 (3d

8

Cir. 1994) (setting forth traditional elements of attorney client privilege used to identify protected communications).  The privilege is not limited to the actual communication by the client to the attorney:

> Ordinarily the compelled disclosure of an attorney's communications or advice to the client will effectively reveal the substance of the client's confidential communication to the attorney.  To prevent this result, the privilege normally extends both to the substance of the client's communication as well as the attorney's advice in response thereto.

In re Fischel, 557 F.2d 209, 211 (9th Cir. 1977).

"[B]lanket assertions of the privilege are 'extremely disfavored.' . . . The privilege must ordinarily be raised as to each record sought to allow the court to rule with specificity." Clarke v. American Commerce Nat. Bank, 974 F.2d 127, 129 (9th Cir. 1992) (citations omitted). "The party asserting the attorney-client privilege has the burden of proving that the privilege applies to a given set of documents or communications." In re Grand Jury Investigation, 974 F.2d 1068, 1070 (9th Cir. 1992).

Facts an attorney learns from independent sources and discloses to the client, or business communications rather than legal advice, do not fall within the privilege.  Standard Chartered Bank Plc. v. Ayala Int'l Holdings (U.S.) Inc., 111 F.R.D. 76, 79-80 (S.D.N.Y.).

Work-product immunity protects from discovery documents and tangible things that have been prepared by or for a party or his representative in anticipation of litigation or for trial.  Fed. R. Civ. P. 26(b)(3).[6]  Work product includes "the so-called 'qualified work product' (facts derived from an attorney's investigation) and the 'absolute' version (the attorney's mental thought processes)."  Doubleday v. Ruh, 149 F.R.D. 601, 606, 607 (E.D.Cal. 1993); see also,

---

[6] As noted in 1970 by the Advisory Committee on Rules,
"Subdivision (b)(3) reflects the trend of the cases by requiring a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or preparation for trial by or for a party or any representative acting on his behalf."

1   South Yuba River Citizens League v. National Marine Fisheries Service, 257 F.R.D. 607, 611

2   (E.D. Cal. 2009); Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir.

3   1992); Handgards, Inc. v. Johnson & Johnson, 413 F. Supp. 926, 933 (N.D.Cal. 1976).

4          The immunity from discovery is limited.  "Qualified" work product may be

5   discovered if a party demonstrates a substantial need for it and an inability to obtain it by other

6   means without undue hardship.  Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851,

7   863 (1994); Admiral Insurance Co. v. U.S. Dist. Ct. for the District of Arizona, 881 F.2d 1486,

8   1494 (1989); South Yuba River, 257 F.R.D. at 611.  On the other hand, "absolute," or "opinion,"

9   work product – mental impressions, conclusions, opinions, or legal theories – has more stringent

10  protections from discovery.  Id.  "Opinion" work product may be discovered only if mental

11  impressions are at issue and the need for the material is compelling.  Holmgren, 976 F.2d at 577;

12  Handgards, 413 F. Supp at 932-933.

13         Defendant does not help himself by failing to respond to the amended motion and

14  the court will direct the defendant to produce any documentation responsive to RFP nos. 2 and 3

15  within his custody, possession or control in his official capacity as Chief Medical Officer to

16  plaintiff within 21 days of this order.  In doing so, defendant is to produce any relevant Institution

17  Operations Plan (IOP) which encompasses the medical protocol for broken bones, if such exists.[7]

18  Motion for Summary Judgment

19         Defendant Dr. Naku moves for summary judgment on the grounds that there is no

20  evidence he was deliberately indifferent to plaintiff's medical needs; alternatively, defendant

21  claims entitlement to qualified immunity.  Notice of Motion, p. 1.

22

23         [7] Again, in reviewing the February 26, 2009, set 3, requests for admission responses – not
    attached to the amended motion to compel, but rather in plaintiff's opposition to the MSJ brought
24  by defendant Naku, it appears that defendant Traquina has admitted plaintiff's requests asserting
    that there are no institution operations plans for the medical department at CSP-Solano that
25  would provide current guidelines or guidelines for diagnosis and treatment of broken bones.
    Plaintiff's Opp. to MSJ , pp. 132-133.  Defendant Traquina must, however, produce any IOP
26  within which any such treatment/diagnosis might be included.

1    *Legal Standard*

2          Summary judgment is appropriate when it is demonstrated that there exists "no

3    genuine issue as to any material fact and that the moving party is entitled to a judgment as a

4    matter of law."  Fed. R. Civ. P. 56(c).

5          Under summary judgment practice, the moving party

6          always bears the initial responsibility of informing the district court
           of the basis for its motion, and identifying those portions of "the
7          pleadings, depositions, answers to interrogatories, and admissions
           on file, together with the affidavits, if any," which it believes
8          demonstrate the absence of a genuine issue of material fact.

9    Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

10   P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

11   issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

12   depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

13   should be entered, after adequate time for discovery and upon motion, against a party who fails to

14   make a showing sufficient to establish the existence of an element essential to that party's case,

15   and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

16   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

17   necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

18   should be granted, "so long as whatever is before the district court demonstrates that the standard

19   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

20   2553.

21         If the moving party meets its initial responsibility, the burden then shifts to the

22   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

23   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

24   (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

25   not rely upon the allegations or denials of its pleadings but is required to tender evidence of

26   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

1   contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

2   106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

3   material, i.e., a fact that might affect the outcome of the suit under the governing law, see

4   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

5   Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

6   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

7   nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

8           In the endeavor to establish the existence of a factual dispute, the opposing party

9   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

10  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

11  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

12  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

13  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

14  56(e) advisory committee's note on 1963 amendments).

15          In resolving the summary judgment motion, the court examines the pleadings,

16  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

17  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

18  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

19  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

20  at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

21  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

22  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

23  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

24  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

25  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

26  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On January 25, 2008, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

### Eighth Amendment Legal Standard

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Indications that a prisoner has a serious need for medical treatment are the following:  the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.  However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

1  which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

2  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

3  should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

4         It is nothing less than recklessness in the criminal sense – subjective standard –

5  disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

6  1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

7  that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

8  114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

9  of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

10 847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

11 knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

12 obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at

13 1981.  However, obviousness per se will not impart knowledge as a matter of law.

14         Also significant to the analysis is the well established principle that mere

15 differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

16 Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

17 662 F.2d 1337, 1344 (9th Cir. 1981).

18         Moreover, a physician need not fail to treat an inmate altogether in order to violate

19 that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

20 1989).  A failure to competently treat a serious medical condition, even if some treatment is

21 prescribed, may constitute deliberate indifference in a particular case.  Id.

22         Additionally, mere delay in medical treatment without more is insufficient to state

23 a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

24 F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

25 no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

26 Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant."  McGuckin, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received equated with deliberate indifference thereby creating a material issue of fact, summary judgment should be entered for defendants.  The dispositive question on this summary judgment motion is ultimately not what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

*Undisputed Facts*

The following of defendant Naku's undisputed facts are expressly undisputed or otherwise conceded by plaintiff.  Where plaintiff posits an objection, although the fact itself is not challenged, the objection is parenthetically noted.  Defendant's undisputed fact (DUF) 1: Binoye Naku, M.D. is a licensed physician and surgeon in the State of California.  DUF 2: During 2004, 2005, and 2006, Dr. Naku was employed by the California Department of Corrections and Rehabilitation as a yard doctor at California State Prison, Solano ("CSP-Solano").  DUF 3: Dr. Naku's responsibilities included treating inmates at various clinics in the prison.  DUF 4: One of the inmates Dr. Naku treated was Abel Cano [plaintiff].  DUF 5: Dr. Naku treated [plaintiff] Cano for a variety of medical issues including the condition of his

wrist.   DUF 6:  The triquetral bone is one of the eight bones that make up a person's wrist.  DUF

7: A triquetral fracture is generally caused by the hyper-extension of the wrist or a direct blow to

the wrist and is generally indicated by pain and limited motion.  DUF 8: An x-ray is essential for

making a definitive diagnosis because pain and limited motion may also be indicative of a sprain.

DUF 9: A non-displaced fracture means that the normal shape and alignment of the bone is

maintained.  DUF 10: Because of this, the bone involved in a non-displaced fracture does not

need to be aligned (or set) by the physician because the bone is not out of alignment.  (Plaintiff

disputes the applicability of DUF 10 to his case but he does not challenge the medical assessment

per se).   DUF 11:  For hand and wrist injuries, the key therapeutic concept is the preservation of

function by use of a splint or brace, two terms often used interchangeably to describe a device

worn by the patient to protect and immobilize the wrist.  DUF 12:  Most wrist fractures can be

successfully treated without surgery and nondisplaced fractures generally call for conservative

treatment.   (Plaintiff's caveat to this DUF is again, not to the medical assessment, but, rather, he

objects to any implication that he received conservative treatment).  DUF 13:  A non-displaced,

or even minimally-displaced, triquetral fracture usually heals uneventfully with immobilization

achieved through the use of a splint or brace.  DUF 14: A non-displaced or minimally displaced

triquetral fracture is generally treated in much the same way as a wrist sprain.   DUF 15:

Compared to fractures in other bones of the body, a triquetral fracture tends to heal very well

because of the rich blood supply to the area.  DUF 16:   The splint or brace is used until union of

the fractured bone is achieved, which generally takes three to six weeks.  (Plaintiff does not

dispute this fact per se but protests that this treatment for him was very delayed – see below).

DUF 17: A mild pain reliever may be prescribed while the fracture heals.  DUF 18:  Progressive

mobilization and weaning from a splint should generally occur no more than six weeks after the

injury.  DUF 19:  Re-evaluation of the wrist is appropriate six weeks post-injury because stiffness

of the wrist may occur which requires referral to physical therapy.   DUF 20: Defendant Naku's

first involvement in the treatment of plaintiff's wrist occurred on July 7, 2006, when he

conducted a follow-up examination regarding an abnormal x-ray of plaintiff's wrist.  DUF 21:
Prior to this examination, defendant Naku reviewed plaintiff's medical chart to become
knowledgeable about the history of plaintiff's wrist.  DUF 26: On May 24, 2006, plaintiff
underwent an x-ray of his right wrist which showed a probable non-displaced triquetral fracture.
DUF 27: Plaintiff's records reflect that on June 27, 2006, Dr. Rallos ordered a follow-up for
plaintiff due to the abnormal x-ray.  DUF 28: Defendant Naku conducted a follow-up
appointment on July 7, 2006.  DUF 30:  Defendant Naku ordered an orthopedic consult.  DUF
31:  To treat any pain plaintiff might be suffering as a result of this fracture, defendant Naku
ordered a prescription for the pain-reliever Tylenol.  DUF 33:  In preparation for responding to a
grievance filed by plaintiff, defendant Naku reviewed plaintiff's medical chart to determine what
had occurred since he examined plaintiff on July 7, 2006.  DUF 34:  Defendant Naku's review of
plaintiff's medical chart showed that plaintiff was seen at the University of California, Davis
(UCD) for an orthopedic consultation on August 2, 2006.  DUF 38: Active motion exercises are
to be done with the wrist brace off, although the patient retains the wrist brace to wear when not
engaging in these motion exercises.  DUF 39:  In responding to plaintiff's inmate grievance,
defendant Naku noted that plaintiff had suffered a triquetral fracture in his right wrist after a fall
and that he had been seen and evaluated by the orthopedic specialist at the University of
California, Davis.  DUF 40:  Based on the recommendations of the orthopedic specialist,
defendant Naku wrote an order for plaintiff to have a CT scan of his right wrist.  DUF 42:
Defendant Naku next saw plaintiff for a follow-up on October 5, 2006.  DUF 43:  During this
examination, defendant Naku noted plaintiff's wrist injury and that plaintiff had no new
complaints.  DUF 44:  An external examination showed nothing remarkable and defendant Naku
simply re-stated the initial diagnosis of a right triquetral fracture.  DUF 49:  Defendant Naku also
ordered a follow up in 30 days and, because climbing into an upper bunk could be difficult if
plaintiff's wrist was not yet healed, defendant Naku ordered that plaintiff be provided with a
lower bunk.  DUF 51:  This CT scan showed a small cortical (outer portion) avulsion fracture

from the dorsal (back side) aspect of the triquetrum.  DUF 52:  An avulsion fracture is a bone fracture which occurs when a fragment of bone tears away from the main mass of bone as a result of physical trauma.  DUF 53:  If the fracture is small, it is usually sufficient to treat with rest and a brace or splint.  DUF 55:  The CT scan showed a borderline marginal spur (bony projection) at the triquetral articulation, i.e., where the bone makes contact, with the hamate bone and the other regional bones were intact.  DUF 58:  Defendant Naku's examination of plaintiff on October 5, 2006, and his review of the report of plaintiff's CT scan on or about that date, were the last occasions defendant Naku was involved in plaintiff's medical care.  DUF 60:  The MR arthrogram was performed on April 5, 2007, and no definite abnormality was noted, although there may have been a tear of the cartilage that was not clearly delineated.  DUF 61:  On March 24, 2008, plaintiff was again seen by the orthopedist and underwent x-rays of his right wrist. DUF 62:  The x-ray results were essentially within normal limits, with mild degenerative changes in the wrist but no acute fracture or dislocation was seen.  DUF 63:  The medical records reflect that plaintiff was told he could participate in activities to the extent of his pain tolerance and that he should follow up with medical care as needed.  DUF 64:  The records do not indicate that surgery was deemed appropriate.  On April 23, 2008, plaintiff's doctor reiterated to him that he should engage in activity as tolerated with regard to his right wrist.  DUF 65: Plaintiff was seen again by a doctor on July 29, 2008, complaining of stiffness in his right wrist; the doctor noted that plaintiff had almost normal rotation in his wrist and, per the records, instructed plaintiff to increase his wrist exercise.

### *Disputed Facts*

Plaintiff contends that many of defendant's undisputed facts are essentially generic[8] and not applicable to, or indicative of, the individual treatment that plaintiff received

---

[8]  Of course, plaintiff should not complain that one of defendant's "generic" undisputed facts is that he is a licensed physician (which fact plaintiff does not dispute herein) when one of the allegations of his complaint is that defendant Naku may be practicing medicine without a license.  Complaint, p. 7 (court pagination, p. 10).

1   from defendant Naku.  Opposition (Opp.), p. 6.[9]  Plaintiff argues that defendant Naku was

2   deliberately indifferent in the treatment, or lack thereof, that he provided to plaintiff for a broken

3   bone in his wrist, which he describes as "a severe medical condition" and that there was objective

4   medical criteria for the appropriate medical treatment that defendant Naku failed to follow with

5   "culpable disregard."  Id., at 7, & Opp., at p. 97, plaintiff's declaration ¶ 2.  Here the court notes

6   that defendant objects to several pieces of evidence produced by plaintiff attached to his

7   declaration in support of his opposition, including a portion of defendant Naku's interrogatory

8   responses, which defendant correctly asserts is incomplete and lacks authentication, a proof of

9   service, or signed verification.  Reply, p. 8.  Defendant also objects to the Institutions Operations

10  Plan (IOP)(discussed below) on grounds of lack of authentication, hearsay and irrelevance.  Id.

11  Defendant Naku objects as well to the medical records and inmate appeal records that plaintiff

12  produces.  Id.   Some of defendant's objections are well-founded, such as, questioning the

13  relevance of the particular IOP of which plaintiff produces only a portion which, again, is

14  discussed below.  However, as to a lack of authentication, of the partial interrogatory responses,

15  plaintiff's medical records and inmate grievances, plaintiff attests in a "verification" attached to

16  his declaration that his exhibits are "true and correct copies" of discovery response documents or

17  from his health record or other documents provided by defendants.  See, plaintiff's Dec., p. 114.

18  Moreover, many of the medical record and inmate appeal exhibits duplicate those produced by

19  defendants in their motion.  Defendants' objections to plaintiff's use of copies of medical

20  records, etc., for lack of authentication are overruled for purposes of the pending motions.  See

21  Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made

22  admissible at trial maybe considered on summary judgment); see also Aholelei v. Hawaii Dept.

23  /////

24  /////

25  _____

26      [9] The court's electronic pagination is referenced (based on a total of 183 pages filed in opposition and in support of the opposition).

1   of Public Safety, 220 Fed. Appx. 670 (9th Cir. 2007).[10]

2          Plaintiff disputes defendant's assertion in DUF 22 that he was first seen by a Dr.

3   Rallos (not a party) two weeks from the date of his injury, arguing that the reference to seeing

4   that doctor two weeks from the accident causing his injury arose from his own broken English

5   when he spoke to Dr. Rallos of his fall in the shower two days earlier.  Opp., p. 10.  He posits

6   that he was seen by Dr. Rallos on May 23, 2006, two days after the May 21, 2006, injury, and

7   that on that day Dr. Rallos ordered x-rays, a splint, light duty for three months and follow-up.

8   Plaintiff's Dep: 16:1-15; Opp., (plaintiff's disputed facts) pp. 81, plaintiff's Dec. in Opp. at p.

9   101, ¶ 21 and p. 148 (copy of May 23, 2006 physician's orders wherein, inter alia, three months

10  of light duty, a right wrist splint and x-ray(s), and a four-week follow-up are therein ordered);

11  Exh F to Opp., plaintiff's 602 grievance dated July 19, 2006, CSP-S 06-02489, pp. 171-172 &

12  Exh. E to verified complaint (wherein, inter alia, plaintiff in an emergency appeal complains of

13  having been in constant pain and without treatment since having broken his wrist as of May 21,

14  2006; of having seen Dr. Naku on or about June 24, 2006, whereupon defendant Naku told

15  plaintiff his right wrist was broken but that no cast could be put on because Solano State Prison

16  had neither the facilities nor medical staff to do so;[11] of Dr. Naku's, according to plaintiff, having

17  ordered additional x-rays and prescribed Tylenol for plaintiff's pain but as of the date of the

18  inmate appeal of his not having received Tylenol or any other medication, as well as no treatment

19  for the wrist break).   In his deposition, plaintiff identifies the gravamen of his inmate appeal: "I

20  am appealing the deliberate indifference of medical staff in failure of any treatment whatsoever

21  of my broken wrist, right wrist."  Plaintiff's Dep. (lodged) 14:16-18; Exh. E to verified

22

23      [10]  It is unclear to the undersigned what rules of procedure on summary judgment are
    applicable to litigants appearing pro se.  See Richardson v. Runnels, __F.3d__, 2010 WL 92777

24  (9th Cir. 2010), a case in which the pro se plaintiff not only failed to supply documents required
    by the local rules, but more importantly, failed to tender any evidence on the facts he desired to

25  controvert.  However, these deficiencies were not important to the Richardson court.

26      [11] See also, plaintiff's Dep. 26:15-20; 27:1-12.

complaint.   Plaintiff insists that defendant failed to provide a timely diagnosis or treatment for

his injury on May 21, 2006, and, notwithstanding the approximate June 24, 2006, date evidently

misidentified by plaintiff in the grievance above as when he first saw defendant Naku, it is

undisputed that plaintiff was not seen or evaluated by Dr. Naku until July 7, 2006.[12]  DUF 20.

This is some six weeks from the initial treatment on May 23, 2006, and taking of x-rays.

Plaintiff states in his deposition that he "broke his hand" in May and not until

three months later, on August 30, 2006, was he given Tylenol by the defendant and a right brace

for his broken hand/wrist.  MSJ, Exh. B, plaintiff's Dep. 22:10-23; see also, Opp., p. 116,

defendant Naku's response to RFA[13] # 15; Opp.,  Exh. E, p. 160.  In Exh. F to plaintiff's

declaration in Opp., CSP-S 06-02489, in defendant Naku's first level response to the grievance

referenced above, dated August 30, 2006, Dr. Naku references plaintiff's having been seen and

evaluated by UCD and states that UCD recommended a CT scan of plaintiff's right wrist, which

he, Naku, has ordered, stating that plaintiff was to be reevaluated.  Opp., p. 173; see also, DUF

34, 39, 40.  In plaintiff's appeal of the first level response, dated September 12, 2006, he

acknowledges that following the initial filing of his grievance that he was transported to UCD,

where he was examined and informed that his wrist bone had healed improperly because it was

not treated appropriately when first broken.  Id., at 174; see also, plaintiff's Dep.:31:11-14,

33:18-21; 51:23-52:7; Exh. K to verified complaint.  He asserts therein that his main grievance

[12] However, plaintiff, in addition to the mis-identification of June 24, 2006, identified in the grievance, adds to the confusion by denying the defendant's request for admission on October 20, 2008, that he was first seen for his wrist injury by defendant Naku on July 7, 2006.  MSJ, Exh. A to Declaration of Matthew Ross Wilson, ¶ 3.  In his deposition, he testifies that he was first seen by Dr. Naku on July 7, 2006.  Plaintiff's Dep. 25:15-21.

[13] Plaintiff's requests for admission are attached to his declaration in opposition.  In his response to RFA # 15, defendant Naku admits having responded to plaintiff's 602 on August 30, 2006, about three months after plaintiff claimed to have his broken wrist and that on that day he ordered Tylenol for plaintiff (although the defendant asserts that this was not due to the 602 but rather because of "plaintiff's subjective complaint of pain," which might be construed as a distinction without much of a difference).  In addition, the defendant admits having ordered a right wrist brace and CT scan on Aug. 30, 2006.

that medical staff has been deliberately indifferent to his suffering pain without medication for three months has not been addressed by defendant Naku, and he seeks competent, adequate medical treatment for his wrist.  Id., at 173-174.

Defendant sets forth as an undisputed fact that plaintiff had a splint on his right wrist when he saw plaintiff on July 7, 2006 (DUF 29).  In support of this assertion, the defendant relies on his declaration and outpatient interdisciplinary progress notes, which he states he wrote, attached to the declaration as Exhibit B.  MSJ, Naku, Dec., ¶¶ 9, 13 and Exh. B.  The attached progress notes do indeed show an entry dated 7/7/06, which states, inter alia, "splint in place." See also, Exh. D to verified complaint.  Moreover, it does not appear to be in dispute that Dr. Rallos, on May 23, 2006, had ordered a splint for plaintiff's right wrist (see above).  Plaintiff, however, is adamant that he never had a splint or brace on his wrist until August 30, 2006, and his support for that representation is his own declaration, his deposition and progress notes showing an entry for August 30, 2006, when a right wrist brace was evidently ordered.  Opp. at 102, 105, plaintiff's Dec. at ¶¶ 30, 40, 41, and p. 149 copy of outpatient interdisciplinary progress notes showing an entry for Aug. 30, 2006, by defendant Naku, ordering a right wrist CT, right wrist brace, and Tylenol (which fact is undisputed); plaintiff's Dep. 22:9-23; 27:21-23; 35:2-6. Plaintiff testified that he had been wearing the right wrist brace ever since.  Plaintiff's Dep. 22:24-23:3.  This indeed implicates a genuine issue of fact that the court on this motion for summary judgment is unable to resolve.  Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1036 (9th Cir.  2005)("[I]t is axiomatic that disputes about material facts and credibility determinations must be resolved at trial, not on summary judgment.") [internal citation omitted].

Nor is this a fact which must be the subject of expert opinion.  Dr. Naku does not dispute the necessity of having immobilized the fracture at the earliest possible opportunity. Whether he did or not is simply a historical fact.  Nor, of course, can Dr. Naku be held personally liable for the absence of a splint prior to the first time he saw plaintiff.  However, if plaintiff is to be believed, Dr. Naku did not take action to immobilize the wrist, and in a fashion "cooked the

books" to record that a splint was in place.  Improbable as this sounds, a jury, not the

undersigned, gets to make that determination.

Defendants argue that when plaintiff was last seen by defendant Naku his "minor

wrist fracture had not yet healed," thus no physical therapy was as yet appropriate.  MSJ, p. 14.

They further contend that the March 24, 2008, x-rays showing no acute fracture or dislocation in

his right wrist and that he could participate in activities to the extent of his pain tolerance and

that no surgery was deemed appropriate show the success of plaintiff's treatment.  Id.  In

addition, however, to issues including whether or not plaintiff had a splint on at the July 7, 2006,

first visit with Dr. Naku, and why, if not, a brace was not ordered until August 30, 2006, and to

what extent plaintiff had appropriate pain medication, the question remains how it is on the last

involvement Dr. Naku had with plaintiff in October, 2006, some five months after the injury

occurred in May, 2006, how it is that the CT scan still showed an avulsion fracture, particularly

when Dr. Naku himself states that for the type of fracture involved, a splint or brace is generally

used until "union of the fractured bone is achieved, which generally takes three to six weeks."

MSJ, Naku Dec., ¶ 5.  At the time of his deposition, January 30, 2009, plaintiff stated that he

still had a lot of pain, still had to wear his right wrist brace, and could not bend or use his right

hand normally.  Plaintiff's Dep. 18:13-19:5.  Plaintiff asserts that he can no longer use his right

hand to work or engage in other activities.  Plaintiff's Dep. 19:22-20:14; 20:23-21:11.   He

testified that his wrist causes him a lot of pain and that movements/exercises he tries, per the

UCD doctor, hurt a lot.  Plaintiff's Dep. 21:13-24.[14]

\\\\\

\\\\\

---

[14]  An inference can be drawn from plaintiff's papers that he believes any medical condition which is not cured, i.e., he is left with no restrictions on movement and no pain, have *per se* been treated improperly.  However, this inference drawing will have to await trial as drawing less than the most favorable inferences to the non-moving party may not be made on summary judgment.

1          *Qualified Immunity*

2          Defendant Naku also moves for summary judgment as to the Eighth Amendment

3 claim on grounds that he is entitled to qualified immunity.

4          In resolving a claim for qualified immunity the court addresses two questions: (1)

5 whether the facts, when taken in the light most favorable to plaintiff, demonstrate that the

6 officer's (or in this case, physician's) actions violated a constitutional right and (2) whether a

7 reasonable officer (physician) could have believed that his conduct was lawful, in light of clearly

8 established law and the information the officer possessed.  Anderson v. Creighton, 483 U.S. 635,

9 107 S.Ct. 3034 (1987).   Although the Supreme Court at one time mandated that lower courts

10 consider these two questions in the order just presented, more recently the Supreme Court

11 announced that it is within the lower courts' discretion to address these questions in the order that

12 makes the most sense given the circumstances of the case.  Pearson v. Callahan, --- U.S. ----, 129

13 S.Ct. 808, --- L.Ed.2d ----, 2009 WL 128768 (January 21, 2009).

14          Defendant Naku argues that "[n]o physician would reasonably believe that

15 providing a wrist brace and pain-reliever to a patient with a non-displaced triquetral fracture,

16 referring him for an orthopedic consultation and ordering a CT scan pursuant to the

17 recommendation of the orthopedic consultant, violated" plaintiff's  clearly established right,

18 citing Saucier v. Katz, 533 U.S. 194, 201-205, 121 S. Ct. 2151 (2001).  MSJ, p. 12; Reply, p. 6.

19 However, taken in the light most favorable to plaintiff, that defendant Naku failed to ascertain

20 that plaintiff received adequate pain medication for a painful, fractured wrist from, at a

21 minimum, July 7, 2006, until August 30, 2006 (a period of almost two months), which means

22 from plaintiff's perspective from the May 21, 2006, injury (for a total of a little more than three

23 months) and failed to provide a splint or brace for plaintiff's right wrist until August 30, 2006

24 (again, three months from the date of injury), which defendant Naku, himself, deems to be

25 appropriate for a non-displaced, or even minimally-displaced, triquetral fracture and which

26 should have occurred much earlier for the fractured bone to heal which, according to the

24

1  defendant, generally takes three to six weeks, such actions or omissions rise to the level of

2  deliberate indifference to a serious medical need.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir.

3  2006).  Except in unusual medical circumstances, an issue of fact regarding deliberate

4  indifference will not permit a finding of qualified immunity, i.e., that despite the inference of

5  deliberate indifference which must be drawn, a reasonable physician would not have known that

6  being deliberately indifferent to appropriate medical treatment violated clearly established law.

7  The finding of an issue of fact regarding deliberate indifference is conclusively antagonistic to

8  the qualified immunity defense on summary judgment.

9        Accordingly, IT IS ORDERED that plaintiff's unopposed amended motion to

10  compel, filed on June 22, 2009 (docket # 31), is granted in part and denied in part: the motion is

11  granted as to RFP nos. 2 and 3, set two, and defendant Traquina must produce responsive

12  documentation within his possession, custody and control, as set forth above, in his official

13  capacity as Chief Medical Officer at CSP-Solano, within 21 days; the motion is denied as to RFP

14  no. 1.

15        IT IS HEREBY RECOMMENDED that defendant Naku's motion for summary

16  judgment, filed on June 26, 2009 (docket # 32), be denied.

17        These findings and recommendations are submitted to the United States District

18  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

19  one (21) days after being served with these findings and recommendations, any party may file

20  written objections with the court and serve a copy on all parties.  Such a document should be

21  captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

22  objections shall be served and filed within fourteen (14) days after service of the objections.  The

23  \\\\\

24  \\\\\

25  \\\\\

26  \\\\\

1   parties are advised that failure to file objections within the specified time may waive the right to

2   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: 01/21/2010

        /s/ Gregory G. Hollows

        _____

        UNITED STATES MAGISTRATE JUDGE

GGH:009
cano2203.msj+